[Cite as *State v. Lazzerini*, 2021-Ohio-1998.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Earle E. Wise, Jr., J. |
| -vs- | |
| | Case No. 2019CA00142 |
| FRANK D. LAZZERINI | |
| Defendant-Appellant | O P I N IO N |

CHARACTER OF PROCEEDINGS:     Appeal from the Stark County Court of
Common Pleas, Case No. 2018-CR-0282

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     June 11, 2021

APPEARANCES:

For Plaintiff-Appellee

KYLE L. STONE
Prosecuting Attorney
Stark County, Ohio

KATHLEEN TATARSKY
VICKI L. DESANTIS
Assistant Prosecuting Attorney
Appellate Division
110 Central Plaza South – Suite #510
Canton, Ohio 44702-1413

For Defendant-Appellant

BRADLEY R. IAMS
301 Cleveland Avenue, N.W.
Canton, Ohio 44702

*Hoffman, P.J.*

**{¶1}** Defendant-appellant Frank Lazzerini appeals the judgment entered by the Stark County Common Pleas Court convicting him of 187 crimes including trafficking in drugs, aggravated trafficking in drugs, illegal processing of drug documents, engaging in a pattern of corrupt activity, involuntary manslaughter, telecommunications fraud, Medicaid fraud, tampering with records, and grand theft, and sentencing him to an aggregate term of incarceration of 113 years. Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

**{¶2}** Appellant became a licensed physician in Ohio in 2008. He opened Premier Family Practice in Massillon, Ohio, in 2012. Appellant was the sole practitioner at his general family practice. After an investigation into Appellant's medical practice by the Jackson Township Police Department, the Ohio Board of Pharmacy, the Ohio Attorney General's Office, the Ohio Medical Board, and the Drug Enforcement Agency, a search warrant was executed at Premiere Family Practice on February 17, 2016.

**{¶3}** The investigation revealed Appellant was running what is known as a "pill mill." A pill mill is a term used to describe a doctor, clinic, or pharmacy which prescribes or dispenses powerful narcotics inappropriately or for non-medical purposes. Patients seen by Appellant generally had pain or pain-related complaints and diagnoses, and received "cookie cutter" treatment from Appellant. While Appellant often gave routine and duplicative orders for blood work and x-rays, referrals to chiropractors, physical therapists or pain management specialists, there was little follow up by patients. Appellant often made pre-formatted and pre-signed orders simply to make the medical work record appear complete. Meanwhile, Appellant prescribed multiple controlled substances to his

patients. Medical records confirmed Appellant often increased strength and dosage of controlled substances and opioids with little or no medical justification.

{¶4} A review of the Ohio Automated Rx Reporting System (OARRS) revealed between November 22, 2015 and December 22, 2015, Appellant was the second highest prescriber of controlled substance prescription drugs in Ohio, and he was the highest prescriber between December 22, 2015 and January 22, 2016. From March 27, 2013, through September 17, 2015, Appellant wrote or authorized 20,745 controlled substance prescriptions. Appellant prescribed narcotics for patients living as far away as West Virginia.

{¶5} In his medical office, Appellant laughed and made fun of his patients, joking he needed a "Percocet vending machine" and describing his patients as "Perc-Monsters." He saw a significant number of patients each day, often spending less than five minutes with each patient. Appellant forced employees to schedule 70-80 patients a day and threatened to terminate his employees for failing to do so. After returning from a vacation, Appellant saw 131 patients on September 10, 2015, and 103 patients the next day. Appellant rarely provided the required warnings to patients regarding the dangerous nature of prescribed narcotics.

{¶6} Appellant purposely targeted Medicaid patients in order to bill the Ohio Medicaid Program at a high level. Appellant used fraudulent billing to get reimbursed at a much higher rate from Medicaid than he was entitled. He bragged about overbilling Medicaid. According to the State's coding expert for Medicaid, Dr. Daniel Bowerman, Appellant submitted claims based on false records, which the expert termed "nonsense notes." The Medicaid program paid Appellant over $12,000 to which he was not entitled.

Further, the amount Medicaid paid for prescriptions written by Appellant which were outside the ordinary course of medical practice and for purposes other than a legitimate medical purpose totaled $58,834.66.

{¶7} Expert review of medical records confirmed Appellant routinely prescribed opioids and benzodiazepines to patients who were very ill with heart failure, morbid obesity, COPD, obstructive sleep apnea, unstable psychiatric conditions, or a combination of these things. His records indicated he frequently increased opioid dosages with little or no documented medical support. He continued prescribing opiates to patients showing out of control behavior, inconsistent toxicology testing, and diverting of medications.

{¶8} Jamie Hayhurst died of a drug overdose on August 12, 2014. Hayhurst was a patient of Appellant's practice. On August 5, 2014, Appellant prescribed a number of opioids and other drugs to Hayhurst, including Percocet, fentanyl, alprazolam, and hydrocodone. Hayhurst failed a urine screen on August 5, because her previously prescribed controlled substances were not in her urine, indicating she had not been taking medications as prescribed. Appellant refilled all of her prescriptions and dismissed her from his practice.

{¶9} After an autopsy, the Stark County Coroner's Office ruled Hayhurst died from acute intoxication caused by the combined effects of multiple drugs including alprazolam, fentanyl, and oxycodone. All medications found in Hayhurst's system were prescribed by Appellant.

{¶10} Appellant was charged by the Stark County Grand Jury in a 272 count indictment including charges of engaging in a pattern of corrupt activity, involuntary

manslaughter, telecommunications fraud, tampering with records, Medicaid fraud, grand theft, aggravated trafficking in drugs with major drug offender specifications, trafficking in drugs, and illegal processing of drug documents. Eight charges were dismissed upon motion of the prosecutor prior to trial. The case proceeded to jury trial in the Stark County Common Pleas Court on the remaining charges. Following trial, Appellant was convicted of 187 counts. Appellant was convicted upon the jury's verdict of one count each of engaging in a pattern of corrupt activity, involuntary manslaughter, telecommunications fraud, tampering with records, Medicaid fraud, and grand theft. He was convicted of numerus counts of aggravated trafficking in drugs, eight of which included major drug offender specifications. He was convicted of multiple counts of trafficking in drugs. All counts of aggravated trafficking and trafficking in drugs involved prescriptions of controlled substances to forty-two individual patients. Appellant was also convicted of numerous counts of illegal processing of drug documents, and the court found in favor of the State on the forfeiture specification. The trial court sentenced Appellant to an aggregate prison term of 113 years.

{¶11} It is from the August 22, 2019 judgment of the Stark County Common Pleas Court Appellant prosecutes this appeal, assigning as error:


I.   THE TRIAL COURT ERRED IN EXCLUDING APPELLANT FROM THE INDIVIDUAL VOIR DIRE OF THE FIFTY-SIX POTENTIAL JURORS, CONTRARY TO CRIMINAL RULE 24, CRIMINAL RULE 43, AND HIS RIGHTS UNDER THE OHIO AND UNITED STATES CONSTITUTIONS.

II.   THE TRIAL COURT ERRED IN PERMITTING THE STATE OF OHIO TO INTRODUCE IRRELEVANT EVIDENCE THEREBY PREJUDICING APPELLANT'S RIGHT TO A FAIR TRIAL.

III.   THE TRIAL COURT ERRED IN SENTENCING APPELLANT.

IV.   THE GUILTY VERDICTS IN COUNTS 6-272 ARE INCONSISTENT, UNSUPPORTED BY THE EVIDENCE, AND CONTRARY TO LAW.

V.   THE TRIAL COURT ERRED IN ITS INSTRUCTIONS TO THE JURY.

VI.   THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS THE EVIDENCE OBTAINED BY EXECUTING SEARCH WARRANTS AT HIS HOME AND BUSINESS WITHOUT PERMITTING HIM TO CHALLENGE THE SEARCH WARRANT AFFIDAVIT BY WAY OF A FRANKS HEARING.

VII.   APPELLANT WAS DEPRIVED OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY BOTH THE OHIO AND UNITED STATES CONSTITUTIONS.

I.

{¶12} In his first assignment of error, Appellant argues he was denied his constitutional right to be present at every critical stage of the proceedings when he was excluded from individual voir dire of some members of the jury pool.

**{¶13}** During voir dire, the trial court indicated counsel and the court had some questions related to a questionnaire the jurors had been given. Because the questioning might involve sensitive issues which required privacy, the court reporter, the judge, and counsel for both parties went into the deliberation room, calling the jurors identified for specific questioning one by one. Appellant objected to his exclusion from the room. The trial court overruled the objection, finding it was no different than a sidebar conference from which Appellant would be excluded.

**{¶14}** After individual questioning concluded, Appellant renewed his objection to his exclusion from the deliberation room, arguing no one in the courtroom has more experience with opiate prescriptive practices than Appellant. The trial court admonished Appellant for conduct he previously displayed in the courtroom, shaking his head and speaking out of turn. Appellant then requested a mistrial. The court overruled the motion. The court noted the proceedings in the deliberation room were conducted at the request of counsel for Appellant. The court conducted limited individual questioning of 56 jurors in the jury room, 23 of which were excused for cause. Nine jurors were empaneled who participated in the questioning in the deliberation room.

**{¶15}** Crim. R. 43(A)(1) provides:

Except as provided in Rule 10 of these rules and division (A)(2) of this rule, the defendant must be physically present at every stage of the criminal proceeding and trial, including the impaneling of the jury, the return of the verdict, and the imposition of sentence, except as otherwise provided by these rules. In all prosecutions, the defendant's voluntary absence after

the trial has been commenced in the defendant's presence shall not prevent continuing the trial to and including the verdict. A corporation may appear by counsel for all purposes.

**{¶16}** Appellant argues we should review this assignment of error under a structural error analysis. Structural errors are a limited class of constitutional defects, "that defy harmless-error analysis and are cause for automatic reversal" without a showing a substantial right has been affected. *State v. Perry,* 101 Ohio St.3d 118, 802 N.E.2d 643, 2004–Ohio–297, ¶ 16. Structural error analysis is reserved for "constitutional deprivations * * * affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *State v. Fisher*, 99 Ohio St.3d 127, 789 N.E.2d 222, 2003–Ohio–2761, at ¶ 9. Among the limited number of errors the United States Supreme Court recognizes as structural are the complete denial of counsel, a biased trial court, racial discrimination in the selection of a grand jury, the denial of self-representation at trial, the denial of a public trial, and conviction upon a defective reasonable-doubt instruction. *See Perry* at ¶ 18–21, 802 N.E.2d 643.

**{¶17}** We find the failure to comply strictly with Crim.R. 43(A) is not structural error. *See State v. Armas*, 12th Dist. Clermont No. CA2004-01-007, 2005-Ohio-2793, ¶ 27. Statutory or rule violations, even serious ones, will not sustain a structural-error analysis. *See, e.g., Perry*, *supra*, at 124. Further, Appellant's absence from a portion of the questioning of jurors does not constitute the type of error structural error guards against: the error does not "permeate '[t]he entire conduct of the trial from beginning to end' so the

criminal trial cannot 'reliably serve its function as a vehicle for determination of guilt or innocence.'" *Perry* at ¶ 25.

**{¶18}** The United States and Ohio Supreme Courts have both recognized a defendant's absence does not necessarily result in prejudicial or constitutional error. "[T]he presence of the defendant [in a prosecution for felony] is a condition of due process to the extent a fair and just hearing would be thwarted by [her] absence, and to that extent only." *Snyder v. Massachusetts*, 291 U.S. 97, 107–108, 54 S.Ct. 330, 78 L.Ed. 674 (1934); *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). The defendant's absence in violation Crim. R. 43(A), although improper, may constitute harmless error where he suffers no prejudice. *State v. Williams*, 6 Ohio St.3d, 281, 285–287, 452 N.E.2d 1323 (1983).

**{¶19}** In *Williams, supra,* an issue arose during the jury view conducted during trial. The court conducted voir dire of the affected jurors outside the presence of the defendant. Although the Ohio Supreme Court concluded the trial court committed error in conducting voir dire of the jury without the defendant present, the court found the error was harmless. The court concluded the defendant's attendance at voir dire would have contributed little to his defense. The court further stressed the most "obvious barrier to prejudice" was the presence of the defendant's counsel during the voir dire, as counsel's active participation negated any prejudice from the defendant's absence. 6 Ohio St. 3d at 287.

**{¶20}** While we find the trial court erred in excluding Appellant from the deliberation room during the individual voir dire of some of the jurors, we find any error was harmless. As in *Williams,* counsel for Appellant was present and actively participated

in the individual voir dire.   On the morning of the first day of jury selection, the jurors were given a questionnaire to complete.  The trial judge then gave the parties between 2 ½ and 3 hours to review the answers.  Presumably, Appellant was able to participate with his attorneys in the review of these answers.

{¶21}  When court resumed in the afternoon, the voir dire of jurors whose answers raised questions best inquired about in private began.  Appellant was excluded from this procedure.  When he renewed his objection the next morning before questioning began again, the trial court noted counsel had never asked to confer with Appellant during this process.  Tr. II (26-27).  When voir dire in the deliberation room resumed, the record reflects counsel did on one occasion ask for permission to confer with Appellant, and such permission was granted.

{¶22}  Following the examination of jurors in the deliberation room, general voir dire continued in the courtroom.  Appellant was present for this portion of the proceeding.  All peremptory challenges were executed during this portion of the voir dire.

{¶23}  Appellant argues he had unique knowledge of the "prescriptive practice" of opioids.  However, we have reviewed the transcript of the voir dire of jurors conducted outside his presence, and nothing in the questioning of the jurors during this time reflects a need for such expertise.  Many of the questions dealt with non-medical concerns of jurors, such as not being paid by their employers for service during the lengthy trial, planned vacations, family illness, and newspaper coverage of the trial.  While some jurors had concerns with the over-prescription of opioids in general, there was nothing in the questioning which would reflect a need of or benefit from medical expertise.  Of the 23 jurors excused for cause during the proceeding in the deliberation room, the record

demonstrates either they were dismissed on Appellant's motion or with Appellant's agreement to the dismissal for cause. Further, the questioning outside Appellant's presence was limited to a handful of answers on the questionnaire; all other voir dire of jurors took place in Appellant's presence.

**{¶24}** Appellant points to no specific juror or line of questioning in the proceedings for whom his presence might have made a difference as to the final composition of the jury. Finally, we note the jury as ultimately constituted found Appellant not guilty of approximately one-third of the charges. For these reasons, we find the error in excluding Appellant from a portion of the voir dire in the instant case was harmless.

**{¶25}** The first assignment of error is overruled.

II.

**{¶26}** In his second assignment of error, Appellant argues the trial court erred in admitting evidence of pharmacists' suspicions he was running a "pill mill" because its prejudicial effect outweighed its probative value. He also argues the trial court erred in admitting impermissible character evidence pursuant to Evid. R. 404(B).

**{¶27}** "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.,* 58 Ohio St. 3d 269, 271, 559 N.E.2d 1056 (1991).

**{¶28}** In the State's case-in-chief, five local pharmacists and several pharmacists from the State Board of Pharmacy testified concerning their suspicions Appellant was running a pill mill, and giving cookie cutter treatment to his patients. They testified concerning "red flags" they noticed in Appellant's prescriptions: dosages which were too

high for patients who were "opiate naïve," too many opioid prescriptions for a general family practice, Appellant's patients mostly receiving the same prescriptions regardless of diagnosis, prescriptions not matching the complaints relayed from the patient to the pharmacist, inappropriate prescriptions for juveniles, several patients coming in together with the same prescriptions, writing "stacks" of prescriptions which duplicated prescriptions written for a patient by other specialists, and patients coming from as far away as West Virginia to receive prescriptions from Appellant.

**{¶29}** Appellant argues the trial court erred in admitting this testimony pursuant to Evid. R. 403(A), which provides, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Appellant argues the evidence was not relevant to show the background of the investigation, as the presentation of evidence should have started at the point in time at which he was charged rather than with evidence of the background of the investigation and the "suspicions" of professionals in the industry. Although not separately assigned as error, Appellant argues the error was compounded when he was denied the opportunity to cross-examine John Bonish concerning the basis for his opinion Appellant was providing "cookie cutter' treatment to patients.

**{¶30}** The Ohio Supreme Court has held a physician who unlawfully issues a prescription for a controlled substance not in the course of the bona fide treatment of a patient is guilty of selling a controlled substance. *State v. Sway,* 15 Ohio St.3d 112, 115, 472 N.E.2d 1065, 1068 (1984). Therefore, a primary issue in the instant case was whether Appellant issued prescriptions in the course of bona fide treatment of a patient. A pharmacist has a corresponding responsibility with the prescriber to ensure that a

prescription is issued for a legitimate medical purpose by a licensed prescriber in the usual course of professional practice. *SCP, Inc. v. Ohio State Bd. of Pharmacy,* 5th Dist. Tuscarawas No. 2008 AP 10 0063, 2010-Ohio-701, ¶ 38. A pharmacist must review every prescription for legitimacy and must then make a professional judgment on whether or not to fill the prescription. *Id.*

{¶31} In the instant case, the local pharmacists who testified eventually stopped filling prescriptions written by Appellant because they believed the prescriptions were not issued for a legitimate medical purpose by Appellant. This testimony was clearly relevant to the ultimate determination of whether Appellant could be convicted of the trafficking charges. Crucial to the jury's assessment of the credibility of the testimony of these pharmacists was an understanding of how they arrived at the decision Appellant's prescriptions were not written for a legitimate medical purpose. For the testifying pharmacists, suspicions and red flags in some of Appellant's prescriptions led to paying closer attention to all prescriptions written by Appellant, which led to a decision to refuse to fill the prescriptions, which ultimately led to the Board of Pharmacy's investigation of Appellant, which eventually resulted in the indictment issued by the Stark County Grand Jury. Testimony of these pharmacists as well as investigators at the State Board of Pharmacy concerning their suspicions Appellant was running a pill mill and providing cookie cutter treatment was clearly relevant to the issues in this case, and we find the trial court did not abuse its discretion in finding the probative value of this testimony was not outweighed by its prejudicial effect.

{¶32} Appellant's claim he was curtailed while cross-examining witnesses concerning their suspicions, specifically John Bonish, and his corresponding argument

the State conceded this background investigation evidence was not relevant by its objection to his questioning of Bonish, is not supported by the record.   Appellant was permitted to cross-examine all the testifying pharmacists without objection.  He was able to cross-examine Bonish, who is an investigator for the State Board of Pharmacy but not a licensed pharmacist, at length concerning the red flags he saw when reviewing Appellant's prescriptions and his concerns of cookie cutter treatment.  Appellant was only stopped from pursuing further cross-examination when he presented Bonish with a hypothetical set of medical complaints from a patient, and Bonish responded he "wouldn't know" if the prescription issued by Appellant was valid for this hypothetical patient.  At this point, the trial court sustained an objection to allowing Appellant to continue to present hypotheticals concerning patient care to Bonish.   Bonish was not a medical expert, and his testimony was specifically tailored to what he was trained as an investigator to look for as red flags in prescription records.  Nothing in the State's objection to Appellant's attempt to question Bonish with hypotheticals concerning patient care constituted an admission evidence of red flags and suspected cookie cutter treatment was irrelevant to the State's case.

{¶33} We find the court did not abuse its discretion in admitting the testimony concerning suspicions of Appellant's medical practice.

{¶34} Appellant next argues the testimony of "disgruntled ex-employees" constituted impermissible character evidence.  Although Appellant does not direct this Court to the place in the transcript of the proceedings where he alleges improper evidence was admitted, he generally characterizes this evidence as "such matters as Appellant's affair with a co-worker, his fondness for a particular rap song, his allegedly expensive

habits, his off-colored remarks about patients, and the Medicaid system."    Brief of Appellant, p. 29.

{¶35}  Evid. R. 404(B) provides:

(B) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

{¶36}  "Because R.C. 2945.59 and Evid.R. 404(B) codify an exception to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom*, 40 Ohio St.3d 277, 281-82, 533 N.E.2d 682, 689-90 (1988). Evidence to prove the "type" of person the defendant is in order to show he acted in conformity therewith in the instant case is barred by Evid.R. 404(B). *State v. Greene*, 5th Dist. Tuscarawas No. 2012 AP 02 0018, 2012-Ohio-5624, 983 N.E.2d 773, ¶ 35.

{¶37}  The Ohio Supreme Court has set forth a three-part test for determining the admissibility of other acts evidence:

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R 403.

**{¶38}** *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20 (2012).

**{¶39}** Melissa Reposa, a former employee of Appellant's office, testified Appellant engaged in an affair with Angela Kuhl, an employee of the office.  She testified the affair made working in the office difficult for other employees because Appellant and Kuhl were "making out" and "doing in appropriate things" in the office.  Tr. VIII (80).  She testified Kuhl was not held to the same employment standards as others due to her relationship with Appellant.   Heidi Harshman, also an employee of Appellant's office, testified Appellant asked her to bill an insurance company for an office visit for Kuhl's daughter, when Harshman knew the child was not seen by Appellant on the day in question. Although we find the evidence of Appellant's affair with Kuhl irrelevant and should not have been admitted, we find it to be harmless in light of all of the evidence produced at

trial. On the other hand, the evidence regarding Kuhl's daughter was relevant. Appellant's request an employee bill for a visit which did not occur was clearly relevant to the counts regarding Medicaid fraud and engaging in a pattern of corrupt activity. We find the trial court did not err in admitting this testimony, as it was not impermissible character evidence, but evidence directly relevant to the issues in the case.

**{¶40}** Several employees testified regarding Appellant's "fondness for a particular rap song." Reposa testified Appellant would sing a song in the office about "bringing in the Benjamins," referring to $100 bills. Harshman testified Appellant made employees listen to a song called "First of the Month" which discussed people on welfare getting paid on the first of the month, and using the money for drugs. This evidence was not evidence of Appellant's character, but was direct evidence of Appellant's focus on maximizing income in the office, which was relevant to Appellant's intent and motive to commit the charged crimes in the instant case. Likewise, evidence of Appellant's extravagant lifestyle which included ten luxury cars, expensive dinners, and expensive trips was not character evidence, but was direct evidence of Appellant's intent and motive for the crimes charged.

**{¶41}** Finally, Appellant argues testimony about his comments regarding the Medicaid system and his patients constituted improper character evidence. Harshman testified Appellant joked about patients with erection problems, referred to his patients who displayed drug seeking behavior as "Percocet Monsters," talked about putting a vending machine in the waiting room with Percocet and Vicodin for his patients, and made a drawing of a license place which said VICO-DAN which he wanted for his car. She testified Appellant deliberately billed Buckeye, a Medicaid program, higher, saying Buckeye was his "bitch." Tr. X (39). Reposa testified Appellant would say demeaning

things about overweight patients. She testified Appellant would say he loved Buckeye and ask employees to bring in Buckeye patients, while asking employees to bill Buckeye 99215, the highest code which could be billed. Evidence of statements made by Appellant regarding Buckeye is not evidence of Appellant's character, but direct evidence of Medicaid fraud. Testimony he made demeaning statements about his patients was not character evidence, but direct evidence going to the issue of whether prescriptions were written for a legitimate medical purpose. Likewise, testimony concerning Appellant's statements about his drug-seeking patients was not character evidence, but evidence Appellant was aware the prescriptions he was writing for these patients were not legitimate.

**{¶42}** We find the trial court did not err in admitting the testimony Appellant describes as character evidence in this case, with the exception of the evidence of his affair with an employee. The evidence Appellant complains of was not evidence of other acts offered to show he acted in conformity therewith in the instant case, but instead was direct evidence of the acts charged in the instant case.

**{¶43}** The second assignment of error is overruled.

III.

**{¶44}** In his third assignment of error, Appellant argues the court erred in imposing consecutive sentences, erred in finding the major drug offender specification was proven beyond a reasonable doubt, unconstitutionally punished him for rejecting a plea deal and exercising his right to go to trial, and erred in finding the forfeiture specification was proven beyond a reasonable doubt.

**{¶45} Consecutive Sentencing:**  We first address Appellant's claim the trial court's imposition of consecutive sentences was not supported by the record.

**{¶46}**  R.C. 2929.14(C)(4) provides:

(C)(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶47}** Our standard of review of sentencing is set forth in R.C. 2953.08(G)(2):

The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

**{¶48}** Appellant argues the court erred in imposing consecutive sentences because he helped a lot of people, and comparing a physician to a "street corner drug dealer who uses violence and crime to facilitate an enterprise is simply misguided." Brief of Appellant, p. 32.

**{¶49}** The trial court found in its judgment entry consecutive sentences were necessary to protect the public from future crime and to punish Appellant, and

consecutive sentences are not disproportionate to the seriousness of Appellant's conduct and the danger Appellant poses to the public.  The court further fund the multiple offense were committed as a part of a course of conduct, and the harm caused was so great or unusual that no single prison term adequately reflects the seriousness of Appellant's conduct.

{¶50} Specifically regarding consecutive sentencing, the trial court stated as follows at the sentencing hearing:

A consideration in formulating the sentence, that it is required by law, is to deter the Defendant and others from future conduct.  And to be clear, the sentence is not designed in any way to determine – to deter the medical profession from treating patients in accordance with a hypocratic [sic] oath. Rather, it is designed to deter anyone from abusing the trust given to them by patients, in need, for the purpose of personal financial gain.

And, Mr. Lazzerini, while this Court does not blame you entirely for the opioid epidemic that faces this country, I do blame you for the personal epidemic of each of your clients.

{¶51}  Sent. Tr. 49.

{¶52}  The trial court further stated during sentencing:

Mr. Lazzerini, the State of Ohio has called you a drug dealer [in] a white coat, and this Court finds that your actions in this case are far more egregious than that of any street-corner drug dealer.

Specifically, the Court finds that many patients came to you with legitimate pain, seeking your help and guidance. Instead of treating them in accordance with your oath as a doctor to, quote, do no harm, you became a figurative Dr. Frankenstein, creating by your own hands and in your own words, Perc Monsters who became dependent upon you to feed their unwitting addictions, all while hiding your sole motive, assassing – amassing personal wealth behind the façade of care and concern.

And while you have submitted letters from individuals asserting your ultraism [sic] over any desire to make money, your own words, submitted as evidence during trial, portray a very different image, nor does this Court find that your actions have been a mistake or a lapse in judgment. Rather, the evidence demonstrated your crafted plan to manipulate your patients and the Medicaid system for your own benefit.

You failed to abstain from all intentional wrongdoing and harm, and you abused the bodies of men and women. You broke your oath as a Medical Doctor. And you have brought shame and disgrace to yourself and your profession.

**{¶53}** Sent. Tr. 42-43.

**{¶54}** We find the imposition of consecutive sentences was not contrary to law. We further find the record supports the court's findings under R.C. 2929.14(C)(4). The trial court did not err in imposing consecutive sentences as to some of the convictions in the instant case.

**{¶55} Major Drug Offender Specification:** Appellant argues the trial court erred in sentencing him as a major drug offender pursuant to 2929.01 and 2941.1410.

**{¶56}** R.C. 2929.01(W) defines major drug offender as follows:

> (W) "Major drug offender" means an offender who is convicted of or pleads guilty to the possession of, sale of, or offer to sell any drug, compound, mixture, preparation, or substance that consists of or contains at least one thousand grams of hashish; at least one hundred grams of cocaine; at least one thousand unit doses or one hundred grams of heroin; at least five thousand unit doses of L.S.D. or five hundred grams of L.S.D. in a liquid concentrate, liquid extract, or liquid distillate form; at least fifty grams of a controlled substance analog; at least one thousand unit doses or one hundred grams of a fentanyl-related compound; or at least one hundred times the amount of any other schedule I or II controlled substance other than marihuana that is necessary to commit a felony of the third degree pursuant to section 2925.03, 2925.04, 2925.05, or 2925.11 of the Revised Code that is based on the possession of, sale of, or offer to sell the controlled substance.

**{¶57}** The trial court found Appellant was a major drug offender pursuant to R.C. 2941.1410:

(A) Except as provided in sections 2925.03 and 2925.11 and division (E)(1) of section 2925.05 of the Revised Code, the determination by a court that an offender is a major drug offender is precluded unless the indictment, count in the indictment, or information charging the offender specifies that the offender is a major drug offender. The specification shall be stated at the end of the body of the indictment, count, or information, and shall be stated in substantially the following form:

"SPECIFICATION (or, SPECIFICATION TO THE FIRST COUNT). The Grand Jurors (or insert the person's or prosecuting attorney's name when appropriate) further find and specify that (set forth that the offender is a major drug offender)."

(B) Imposition of a three, four, five, six, seven, or eight-year mandatory prison term upon an offender under division (B)(11)1 of section 2929.14 of the Revised Code, pursuant to determination by a court that an offender is a major drug offender, is precluded unless the indictment, count in the indictment, or information charging the offender with the violation of section 2925.03, 2925.05, or 2925.11 of the Revised Code specifies that the offender is a major drug offender and that the drug involved in the violation is a fentanyl-related compound or a compound, mixture, preparation, or substance containing a fentanyl-related compound. The

specification shall be stated at the end of the body of the indictment, count, or information, and shall be stated in substantially the following form:

"SPECIFICATION (or, SPECIFICATION TO THE FIRST COUNT). The Grand Jurors (or insert the person's or prosecuting attorney's name when appropriate) further find and specify that (set forth that the offender is a major drug offender and the drug involved in the violation is a fentanyl-related compound or a compound, mixture, preparation, or substance containing a fentanyl-related compound)."

(C) The court shall determine the issue of whether an offender is a major drug offender.

(D) As used in this section, "major drug offender" has the same meaning as in section 2929.01 of the Revised Code.

{¶58} Eight counts of aggravated trafficking in the indictment included a specification Appellant was a major drug offender. The trial court found Appellant to be a major drug offender, and on each of these eight counts sentenced Appellant to eleven years incarceration.

{¶59} At trial, Appellant stipulated as to the amounts of drugs prescribed to each patient, which totaled more than 100 times the bulk amount, thus obviating the need for the State to offer each individual prescription into evidence. At sentencing, Appellant argued it was not appropriate to combine the amounts prescribed to each patient to reach the 100 times bulk amount because they were prescribed over a period of time, distinguishing this case from one where an offender is apprehended with a large amount

of narcotics on his person at the time of arrest.  The jury found as to each of these eight counts the State had proven beyond a reasonable doubt Appellant trafficked in more than 100 times the bulk amount.

{¶60}  Appellant now argues despite his stipulation, he was entitled to a review of each and every prescription to determine which prescriptions were for a legitimate medical purpose and which prescriptions were not for a legitimate medical purpose, before the jury could find he trafficked in more than 100 times the bulk amount.

{¶61} As to each of the eight patients to which the major drug offender specifications were attached, the State's expert witness, Dr. Theodore Parran, testified Appellant's course of conduct in prescribing controlled drugs to the patient was done in a manner inconsistent with the usual course of medical practice and other than for a legitimate medical purpose.  As to these patients, Dr. Parran testified to problems with Appellant's prescribing pattern from the start of the course of treatment, either because he prescribed high amounts of narcotics to opiate naïve patients which should have resulted in an accidental overdose if taken as Appellant prescribed,  or because the patient presented with concerns of drug-seeking behavior, i.e:  a letter from the insurance company indicating a concern about abuse, an abnormal toxicology report from a pain management clinic, concerns by the pharmacy with patients seeking more medication before the current prescription ran out,  and a letter from the Department of Job and Family Services expressing concerns about neglect and abuse.  As to each of these eight patients, Dr. Parran testified Appellant's entire pattern of prescribing medication was dangerous and not for a legitimate medical purpose.  While Appellant points to testimony Kevin C. initially was helped by the prescriptions issued by Appellant, the fact the

medication might have helped his pain level is not inconsistent with the expert's opinion Appellant's prescribing pattern to Kevin C. showed from the outset a dangerous pattern and was not medically appropriate.

{¶62} Based on the testimony of Dr. Parran and Appellant's stipulation to the amounts of prescriptions written, we find the jury's finding Appellant trafficked in more than 100 times the bulk amount is supported by the evidence.

{¶63} We further find the trial court did not err in combining the prescriptions to reach the amount of more than 100 times bulk. Appellant was convicted of engaging in a pattern of corrupt activity, and the numerous charges in the case demonstrate his pattern of prescribing narcotics and other controlled drugs to patients for a purpose other than a medically legitimate purpose. The purpose of the enhanced sentence is to punish offenders who traffic in high amounts of drugs. While Appellant argues he is different than the offender apprehended with 100 times the bulk amount of drugs physically in his possession, we find this argument unpersuasive. Presumably, the offender apprehended with 100 times bulk amount in his possession at one time intended to sell the drugs to numerous individuals over a period of time, not unlike Appellant prescribing drugs to numerous individuals over a period of time. We find the trial court did not err in considering the aggregate of prescriptions written over a period of time in reaching 100 times bulk amount.

{¶64} We find the trial court did not err in sentencing Appellant pursuant to the major drug offender specification.

{¶65} **Vindictiveness:** Appellant argues his total sentence of 113 years incarceration was cruel and unusual, and demonstrated vindictiveness for exercising his

right to a jury trial. He argues he was offered a sentence of 27 years before trial in exchange for a guilty plea.

{¶66} "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort * * *." *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), *citing North Carolina v. Pearce*, 395 U.S. 711, 738, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (Black, J., concurring in part and dissenting in part). A sentence vindictively imposed on a defendant for exercising his constitutional right to a jury trial is contrary to law. *See State v. O'Dell*, 45 Ohio St.3d 140, 147, 543 N.E.2d 1220 (1989). However, when a defendant receives a harsher sentence following his rejection of a plea offer, there is not a "reasonable likelihood" the sentence was based on actual vindictiveness, and the defendant must prove actual vindictiveness. *State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, 80 N.E.3d 431, ¶ 18.

{¶67} Appellant has cited to nothing in the record demonstrating the sentence was based on or influenced in any way by his rejection of a plea bargain and his decision to go to trial. We find Appellant has not affirmatively demonstrated the sentence was vindictive merely because it was greater than the plea offer made before trial.

{¶68} **Forfeiture Specification:** Appellant argues the court's finding in the State's favor on the forfeiture specification of watches and computers is not supported by the evidence.

{¶69} The trial court found the State had proven by clear and convincing evidence 404 watches and miscellaneous watch parts and two notebook computers were property and/or proceeds derived indirectly or directly from the commission of the offenses of which Appellant was convicted.

**{¶70}** Appellant was convicted of 187 crimes including trafficking in drugs, aggravated trafficking in drugs, illegal processing of drug documents, engaging in a pattern of corrupt activity, involuntary manslaughter, telecommunications fraud, Medicaid fraud, tampering with records, and grand theft. The evidence at trial demonstrated Appellant derived his income from a medical practice which was a "pill mill," prescribing patients medications for other than a legitimate medical purpose to make money. Further, he derived income from fraudulent billing of the Medicaid system.

**{¶71}** John Bonish testified during the search of Appellant's residence and business, about 400 high end, expensive Swiss watches were recovered, as well as several computers. From the evidence presented at trial concerning Appellant's prescribing and billing practices which were intentionally designed to maximize his income in order to support his lifestyle, we find the trial court did not err in finding these items were proceeds derived directly or indirectly from the numerous charges in this case, and were thus subject to forfeiture.

**{¶72}** The third assignment of error is overruled.

IV.

**{¶73}** In his fourth assignment of error, Appellant argues his convictions are against the manifest weight and sufficiency of the evidence, and the jury's verdicts were inconsistent. He specifically argues the convictions for drug trafficking, illegal use of drug documents, and involuntary manslaughter are against the weight and sufficiency of the evidence.

**{¶74}** In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record,

weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St. 3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, *quoting State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983).

**{¶75}** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks,* 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

**{¶76}** **Drug Trafficking, Illegal Processing of Drug Documents:** Appellant argues his convictions for trafficking and aggravated trafficking in drugs, as well as his convictions of illegal use of drug documents, are not supported by sufficient evidence and are against the weight of the evidence.

**{¶77}** R.C. 2925.23 defines illegal processing of drug documents in pertinent part:

(A) No person shall knowingly make a false statement in any prescription, order, report, or record required by Chapter 3719. or 4729. of the Revised Code.

(B) No person shall intentionally make, utter, or sell, or knowingly possess any of the following that is a false or forged:

(1) Prescription[.]

{¶78}  R.C. 2925.03 defines trafficking and aggravated trafficking in drugs in pertinent part:

(A) No person shall knowingly do any of the following:

(1) Sell or offer to sell a controlled substance or a controlled substance analog;…

(C) Whoever violates division (A) of this section is guilty of one of the following:

(1) If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II, with the exception of marihuana, cocaine, L.S.D., heroin, any fentanyl-related compound, hashish, and any controlled substance analog, whoever violates division (A) of this section is guilty of aggravated trafficking in drugs. The penalty for the offense shall be determined as follows:

(a) Except as otherwise provided in division (C)(1)(b), (c), (d), (e), or (f) of this section, aggravated trafficking in drugs is a felony of the fourth degree, and division (C) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.

(b) Except as otherwise provided in division (C)(1)(c), (d), (e), or (f) of this section, if the offense was committed in the vicinity of a school or in the vicinity of a juvenile, aggravated trafficking in drugs is a felony of the third degree, and division (C) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.

(c) Except as otherwise provided in this division, if the amount of the drug involved equals or exceeds the bulk amount but is less than five times the bulk amount, aggravated trafficking in drugs is a felony of the third degree, and, except as otherwise provided in this division, there is a presumption for a prison term for the offense. If aggravated trafficking in drugs is a felony of the third degree under this division and if the offender two or more times previously has been convicted of or pleaded guilty to a felony drug abuse offense, the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the third degree. If the amount of the drug involved is within that range and if the offense was committed in the vicinity of a school or in the vicinity of a juvenile, aggravated trafficking in drugs is a felony of the second degree, and the court shall impose as a mandatory prison term a second degree felony mandatory prison term.

(d) Except as otherwise provided in this division, if the amount of the drug involved equals or exceeds five times the bulk amount but is less than fifty times the bulk amount, aggravated trafficking in drugs is a felony of the second degree, and the court shall impose as a mandatory prison term a second degree felony mandatory prison term. If the amount of the drug involved is within that range and if the offense was committed in the vicinity of a school or in the vicinity of a juvenile, aggravated trafficking in drugs is a felony of the first degree, and the court shall impose as a mandatory prison term a first degree felony mandatory prison term.

(e) If the amount of the drug involved equals or exceeds fifty times the bulk amount but is less than one hundred times the bulk amount and regardless of whether the offense was committed in the vicinity of a school or in the vicinity of a juvenile, aggravated trafficking in drugs is a felony of the first degree, and the court shall impose as a mandatory prison term a first degree felony mandatory prison term.

(f) If the amount of the drug involved equals or exceeds one hundred times the bulk amount and regardless of whether the offense was committed in the vicinity of a school or in the vicinity of a juvenile, aggravated trafficking in drugs is a felony of the first degree, the offender is a major drug offender, and the court shall impose as a mandatory prison term a maximum first degree felony mandatory prison term.

{¶79} Appellant first argues the jury found him not guilty on 76 counts based upon the "same quality and quantity of evidence" as the guilty verdicts, rendering the verdicts inconsistent. "Inconsistent verdicts on different counts of a multi-count indictment do not justify overturning a verdict." *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 138; *citing State v. Hicks* (1989), 43 Ohio St.3d 72, 78, 538 N.E.2d 1030 (1989), *citing United States v. Powell*, 469 U.S. 57, 68, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). "The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." *Id., citing State v. Adams, 53* Ohio St.2d 223, 374 N.E.2d 137, paragraph 2 of the

syllabus (1978*), death sentence vacated, Adams v. Ohio.,* 439 U.S. 811, 99 S.Ct. 69, 58 L.Ed.2d 103 (1978).

**{¶80}** In the instant case, the jury found Appellant guilty as to some prescribed drugs while finding him not guilty as to other drugs involving the same patients. The State concedes it spent less time at trial on the lower level drug charges, choosing to focus instead on the higher-level controlled substances such as opioids. In accordance with *Hicks, supra,* we find inconsistency in the verdict does not result of out of inconsistent responses to different counts, and the judgment is not against the sufficiency or manifest weight of the evidence on this basis.

**{¶81}** Appellant next argues the verdict is against the weight and sufficiency of the evidence because the jury had to review extensive "mind-numbing" patient medical records, expert reports, and jury instructions. However, this is no different than many other complicated jury trials, both criminal or civil. We find the mere fact the jury was faced with a difficult task in reviewing the records does not render the verdict against the weight or sufficiency of the evidence. The State and the trial court assisted the jury with explanations of the indictments, definitions of the drug charges and medical terminology, expert witness testimony to explain the medical records, and summaries of the evidence. We find the record does not demonstrate the jury lost its way in its consideration of the extensive medical evidence presented in the case.

**{¶82}** Finally, Appellant argues the State failed to provide expert testimony concerning each count in the indictment or for each prescription. As discussed earlier in our discussion of the major drug offender specification, Appellant stipulated to the prescriptions given each patient. At page 36 of its brief, the State has cited to the places

in the transcript where Dr. Parran testified concerning the course of treatment and the prescriptions given to each of the 42 patients named in the indictment. His extensive testimony as to each individual patient extends from page 170 of volume 8 of the transcript through volume 10, page 177 of the transcript. As to each and every patient, Dr. Parran explained how Appellant's entire pattern of prescribing of controlled substances was done in a manner inconsistent with the usual course of medical practice and for other than a legitimate medical purpose. We find the convictions of trafficking, aggravated trafficking and illegal processing of drug documents are not against the manifest weight or sufficiency of the evidence.

**{¶83} Involuntary Manslaughter:** Appellant argues there was insufficient evidence to demonstrate his prescriptions were the "but for" cause of the death of 38-year-old Jaimie Hayhurst. He argues she had other health conditions which could have caused or contributed to her death, and the State failed to present evidence her death was caused by drugs he prescribed.

**{¶84}** Appellant was convicted of involuntary manslaughter in the death of Hayhurst, as defined by R.C. 2903.04(A), which provides, "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

**{¶85}** The coroner's report named the cause of death as "acute intoxication by the combined effects of multiple drugs, including Alprazolam, Fentanyl and Oxycodone." Dr. Parran testified Appellant continued to provide multiple dangerous prescriptions to Hayhurst, despite the fact she had been hospitalized with an accidental overdose and displayed multiple signs, including her in-office behavior, indicating her condition was

deteriorating due to the drugs she was prescribed. Dr. Parran testified there was no legitimate medical purpose for the drugs Hayhurst was prescribed by Appellant.

{¶86} Dr. Frank Miller, the Chief Deputy Coroner of Lorain County, performed the autopsy on Hayhurst. He testified as follows regarding emphysema and other health conditions the victim was dealing with at the time of her death, and the specific circumstances in which her body was found:

Q. So if she wouldn't have had all those drugs in her system, and still had all those things going on, laying facedown, that kind of thing, would she have died?

A. Well, you know, she hadn't any of the days before that with all these diseases. But on this day, she has these drugs, we've measured these levels after she's been found and after she's been autopsied, and these are a major influence on breathing. And she has emphysema, she has a breathing disorder, sleep apnea probably based on her neck anatomy, and is facedown in a pillow which is not going to encourage external ability to exchange air. So I think all these things added together to cause her death.

Q. I see. And what – did you do a cause of death; is that right?

A. Yes.

Q. What was that?

A. The cause of death, it is acute intoxication by the combined effects of multiple drugs including alprazolam, fentanyl, and oxycodone.

And the other significant condition contributing to death, but not a direct cause, is emphysema.

Q. Okay. So emphysema didn't cause her death?

A. No, it contributes – it's another respiratory problem she has and contributes to her death, but it is not the direct cause.

Q. What – and the direct cause is the combined effects of multiple drugs?

A. Yeah, the drug toxicity is the primary, immediate cause.

**{¶87}** Tr. (13) 151-153.

**{¶88}** The State also presented the testimony of Dr. Renee Robinson, a forensic pathologist, who conducted an independent review of the autopsy report, the autopsy photographs and microscopic slides, the medical records from area hospitals and Appellant's office, the coroner's investigative report, the reports from Appellant's expert witnesses, police reports, and EMS reports. Dr. Robinson concurred in Dr. Miller's assessment Hayhurst's death was drug-related, given she had no evidence in life or after death of any other natural process which would cause her death. Tr. (18) 95.

**{¶89}** The State presented expert testimony which, if believed by the jury, would support the jury's finding Appellant's prescription drugs were the "but for" cause of Jaimie's Hayhurst's death. We find the jury did not lose its way in believing this testimony, and the judgment convicting Appellant of involuntary manslaughter is therefore not against the manifest weight or sufficiency of the evidence.

**{¶90}** The fourth assignment of error is overruled.

V.

{¶91}   In his fifth assignment of error, Appellant argues the trial court erred in its instructions to the jury by failing to adequately instruct on the medical exception to the drug trafficking laws, by including a "deliberate ignorance" charge, and by failing to properly instruct the jury on cause of death as to the involuntary manslaughter charge.

{¶92}   A trial court has broad discretion to decide how to fashion jury instructions, but it must 'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.' *State v. Price*, 162 Ohio St.3d 609, 2020-Ohio-4926, 166 N.E.3d 1155, ¶22.  A reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear the jury instructions constituted prejudicial error. *State v. McKibbon*, 1st Dist. Hamilton No. C–010145, 2002–Ohio–2041, ¶ 4, *citing State v. Adams*, 62 Ohio St.2d 151, 154, 404 N.E.2d 144 (1980). In order to determine whether an erroneous jury instruction was prejudicial, a reviewing court must examine the jury instructions as a whole. *State v. Van Gundy*, 64 Ohio St.3d 230, 233–234, 594 N.E.2d 604 (1992). Pursuant to Crim. R. 52(A), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."

{¶93}   **Physician's Standard of Care:** Appellant first argues the trial court erred in its placement of the definition of the physician's standard of care.  Appellant argues the trial court erred in including the following instruction in the glossary of terms, rather than with the instructions defining the crime:

In order to determine if a controlled substance was prescribed or dispensed other than for legitimate medical purposes and inconsistent with the usual course of medical practice and treatment of patients under the laws regulating a physician's practice, you must consider the defendant's subjective state of mind. In – in so doing, you must consider whether the defendant's actions were performed in the course of the bona fide treatment of a patient.

Bona Fide means in or with good faith; honestly, openly and sincerely, without deceit or fraud.

**{¶94}** Tr. (19) 44.

**{¶95}** Appellant concedes he did not object to the placement of this instruction, and thus we must find plain error in order to reverse.

**{¶96}** The Ohio Supreme Court has set forth the following standard of our review of plain error:

Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding an accused's failure to meet his obligation to bring those errors to the attention of the trial court. However, the accused bears the burden to demonstrate plain error on the record, *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16, and must show "an error, i.e., a deviation from a legal

rule" that constitutes "an 'obvious' defect in the trial proceedings," *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

Even if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." *Id*. We recently clarified in *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, that the accused is "required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *Id*. at ¶ 22, *citing United States v. Dominguez Benitez*, 542 U.S. 74, 81–83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004).

If the accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it; we have "admonish[ed] courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " (Emphasis added.) *Barnes* at 27, 759 N.E.2d 1240, *quoting State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶97}** *State v. Thomas*, 2017-Ohio-8011, ¶¶ 32-34.

**{¶98}** Appellant has not demonstrated a reasonable probability of a change in the outcome had the jury instruction been placed somewhere other than the glossary. We note the jury acquitted Appellant of numerous charges to which this instruction was

applicable. Further, the trial court gave the written instructions to the jury in a tabbed notebook, including a table of contents and an alphabetical glossary of terms which applied to the numerous counts. Tr. (18) 19, 28, 41. The jury was therefore able to return to the definitions which applied to the numerous counts of the indictment at any point in its deliberations. We find the trial court did not commit error, plain or otherwise, in including this definition in the glossary rather than repeating the definition with each count to which it applied.

{¶99} **Deliberate Ignorance:** Appellant argues the trial court erred in giving the following "deliberate ignorance" instruction over his objection:

No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the defendant deliberately ignored a high probability that he was practicing beyond the bounds of medical practice or not for a legitimate medical purpose, then you must find that he knew he was doing so.

But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that he was practicing beyond the bounds of medical practice or not for a legitimate medical purpose and that the defendant deliberately closed his eyes to what was obvious. Carelessness or negligence or foolishness on his part is not the same as knowledge and is not enough to convict. This, of course, is all for you to decide.

**{¶100}** Tr. (19) 69-70.

**{¶101}** The "deliberate ignorance" instruction was explained as follows by the United States Court of Appeals for the Sixth Circuit in *United States v. Mitchell*, 681 F.3d 867, 867-77 (6th Cir. 2012):

The disputed instruction, sometimes called the "ostrich instruction," is designed for a very specific situation. The instruction explains to the jury that knowledge, within the meaning of the statute, also includes the deliberate avoidance of knowledge. It is appropriate when: (1) the defendant claims a lack of guilty knowledge; and (2) the facts and evidence support an inference of deliberate ignorance. Before giving the instruction, the district court therefore must determine that there is evidence to support an inference "that the defendant acted with reckless disregard of [the high probability of illegality] or with a conscious purpose to avoid learning the truth." *United States v. Seelig*, 622 F.2d 207, 213 (6th Cir. 1980) (internal quotation marks omitted); *see also Geisen*, 612 F.3d at 487–88 (concluding that a deliberate ignorance instruction was appropriate where evidence established that the defendant "deliberately chose not to inform himself" of the critical facts); *United States v. Stone*, 9 F.3d 934, 937 (11th Cir. 1993) ("A deliberate ignorance instruction is appropriate only when there is evidence in the record showing the defendant purposely contrived to avoid learning the truth." (internal quotation marks omitted)). "Deliberate avoidance is not a standard less than knowledge; it is simply another way

that knowledge may be proven." *United States v. Severson*, 569 F.3d 683, 689 (7th Cir. 2009). Deliberate ignorance "can be the result of a mental, as well as physical effort—a cutting off of one's normal curiosity by an effort of will." *United States v. Hoyos*, 3 F.3d 232, 237 (7th Cir. 1993) (internal quotation marks omitted). To permit a conviction without proof of actual knowledge or deliberate, willful avoidance of that knowledge would simply erase the knowledge requirement from the statute. *See United States v. Heredia*, 483 F.3d 913, 926 (9th Cir. 2007) (en banc) (Kleinfeld, J., concurring). In short, "this instruction, like all instructions, should be given only when it addresses an issue reasonably raised by the evidence." *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir. 1988).

**{¶102}** While Appellant characterizes this instruction as strictly a creation of the federal courts, the instruction has also been given with approval in Ohio state courts.  *See State v. Smith,* 8th Dist. Cuyahoga No. 67524, 1995 WL 363881; *State v. Washington,* 8th Dist. Cuyahoga No. 74850, 1999 WL 1271749; *State v. McKoy*, 8th Dist. Cuyahoga No. 74763, 2000 WL 193142; *State v. McNeal*, 8th Dist. Cuyahoga No. 91507, 2009-Ohio-3888; *State v. Blackshear,* 8th Dist. Cuyahoga No. 95424, 2011-Ohio-1806; *State v. Miller*, 8th Dist. Cuyahoga No. 94662, 2011-Ohio-2388.

**{¶103}** In the instant case, we find the trial court did not err in giving the deliberate ignorance instruction.  Appellant defended the case on the basis he helped many patients, and his prescriptions were written for a legitimate medical purpose.  The State presented testimony of former employees of Appellant's practice, local pharmacists, and other

experts of numerous red flags concerning the negative effect of the prescribed drugs on his patients.   The State presented evidence the medical files of many patients included warnings from pharmacists, the Department of Job and Family Services, local hospitals, and pain management clinics concerning Appellant's patients and the drugs they were taking pursuant his prescriptions, yet his continued response was he (Appellant) was the doctor.  If anything, the deliberate ignorance instruction in this case benefitted Appellant, as it protected him from conviction based on carelessness or negligence.

{¶104} **Involuntary Manslaughter:** Appellant argues the court erred in not instructing the jury on involuntary manslaughter in accordance with the United States Supreme Court's decision in *Burrage v. United States,* 571 U.S. 204 (2014), as adopted by this Court in *State v. Kosto,* 5th Dist. Licking No. 17 CA 54, 2018-Ohio-1925.  Again, Appellant failed to object to the instruction given by the trial court, and we must find plain error in order to reverse.

{¶105} The trial court instructed the jury as follows regarding causation of the death of Jaimie Hayhurst:

> In order to establish that the controlled substance distributed by the defendant resulted in the death of Jaimie Hayhurst, the State must prove that Jaimie Hayhurst died, as a consequence of her use of the controlled substance that the defendant prescribed on or about the dates alleged in the indictment.  This means that the State must prove beyond a reasonable doubt that **but for** the use of the controlled substances that the defendant prescribed Jaimie Hayhurst would not have died.  **But for** causation exists

where the use of the controlled substance combines with other factors to produce death, and the death would not have occurred without the incre- - incremental effect of the controlled substance.

**{¶106}** Tr. (19) 103-104, emphasis added.

**{¶107}** In *Kosto,* the defendant was convicted of involuntary manslaughter with the predicate offense of corrupting another with drugs, to wit heroin.  The coroner testified the cause of death was the combined effect of cocaine and heroin, and could not say with a reasonable degree of certainty the heroin alone caused the death.   In reversing the conviction because it was not supported by sufficient evidence the death was caused by the predicate offense of corrupting another with heroin,  this Court applied the rationale of *Burrage, supra:*

In support of his argument, appellant directs us to *Burrage v. United States,* 571 U.S. 204, 134 S.Ct. 881, 892, 187 L.Ed.2d 715 (2014), which involved a penalty enhancement provision under 21 U.S.C. Sec. 841(b)(1)(C). Said federal statute in essence imposes a 20–year mandatory minimum sentence on a defendant who unlawfully distributes a Schedule I or II drug, when "death or serious bodily injury results from the use of such substance." The United States Supreme Court in *Burrage* granted certiorari on two questions, the first of which was whether the defendant could be convicted under the "death results" provision when the use of the controlled substance was a "contributing cause" of the death. *Id.* at 886. The Court

first determined that the federal statute in question imposes a requirement of "but-for causation." *Id.* at 889–891. Although the Government proposed the argument that an act or omission should be considered a cause-in-fact if it was a "substantial" or "contributing" factor in producing a given result, this was rejected by the Court. *Id.* at 890. The Court instead stated: "The language Congress enacted requires death to 'result from' use of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed." *Id.* at 891. The Court proceeded to hold that "* * * at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." *Id.* at 892…

We recognize that in *Burrage*, the United States Supreme Court was interpreting a penalty enhancement provision in a federal statute, not an Ohio criminal statute. However, this distinction does not dissuade us from applying the rationale of *Burrage* herein, and "* * * we cannot amend statutes to provide what we consider a more logical result." *State v. Link*, 155 Ohio App.3d 585, 2003-Ohio-6798, 802 N.E.2d 680, ¶ 17, *citing State v. Virasayachack* (2000), 138 Ohio App.3d 570, 741 N.E.2d 943. Accordingly, upon review, we find insufficient evidence was presented for reasonable fact finders to conclude beyond a reasonable doubt that appellant was guilty of involuntary manslaughter as charged by the State.

{¶108} *Kosto* at ¶¶22, 24.

{¶109} Notably, this Court did not reach the issue in *Kosto* of whether the trial court erred in failing to instruct the jury in accordance with *Burrage*, as the issue was rendered moot by our finding the conviction was not supported by sufficient evidence. *Id.* at ¶30.

{¶110} We find *Kosto* is distinguishable from the instant case. Unlike *Kosto*, the State in the instant case presented evidence the controlled substances prescribed by Appellant outside the bounds of medical practice or not for a legitimate medical purpose were the but-for cause of Hayhurst's death.

{¶111} Further, subsequent to our decision in *Kosto,* the Ohio Supreme Court addressed the issue of the applicability of the *Burrage* instruction to Ohio law in *State v. Price*, 162 Ohio St.3d 609, 2020-Ohio-4926, 166 N.E.3d 1155. Price argued the trial court's instructions were deficient because they did not require the jury to find both his actions were the but-for cause of serious physical harm to the victim, and his actions were independently sufficient to cause the harm. He argued the trial court essentially permitted the jury to find him guilty if it determined his actions were only a substantial or contributing factor in bringing about the harm. The Ohio Supreme Court rejected his argument, finding the *Burrage* holding was specific to a federal statute and not binding. *Id.* at ¶28. The court further concluded the instruction as given in *Price* required the jury to find Price's act directly produced the victim's death, and without Price's act, the death would not have occurred. *Id.* at ¶36.

{¶112} Similarly, in the instant case, we find the jury instruction given by the trial court specifically required the jury to find "but for" the controlled substances prescribed by Appellant, Jaimie Hayhurst's death would not have occurred. The instruction did not

allow the jury to find the drugs prescribed by Appellant need only be a contributing factor in bringing about her death. We find no plain error in the involuntary manslaughter instruction given by the trial court.

{¶113} The fifth assignment of error is overruled.

VI.

{¶114} In his sixth assignment of error, Appellant argues the trial court erred in denying him a *Franks* hearing on his claims the affidavit supplied to obtain a search warrant of Appellant's home and office contained deliberately and recklessly made false statements, as well as material omissions.

{¶115} In *State v. Khaliq*, 5th Dist. Licking No. 15-CA-64, 2017-Ohio-7136, this Court discussed what a defendant must provide in order to challenge the affidavit submitted by police in order to obtain a search warrant:

> Appellant asserts his motion to suppress presented allegations of deliberate falsehood or reckless disregard for the truth. We disagree.

> In *State v. Jackson*, Ninth Dist. App. No. 14CA100953, 2015–Ohio–3520, the Ninth District held,

> "There is * * * a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks*, 438 U.S. at 171, 98 S.Ct. 2674. "In *Franks v. Delaware* * * *, the United States Supreme Court squarely addressed the issue of when a defendant, under the Fourth Amendment, is entitled to a hearing to challenge the veracity of the facts set forth in the warrant affidavit after the warrant has been issued and executed." *State v. Roberts*, 62 Ohio St.2d 170, 177, 405 N.E.2d 247 (1980).

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient."

*Franks* at 171, 98 S.Ct. 2674.

Moreover, "[e]ven if a defendant makes a sufficient preliminary showing, a hearing is not required unless, without the allegedly false statements, the affidavit is unable to support a finding of probable cause." *State v. Cubic*, 9th Dist. Medina No. 09CA0005–M, 2009–Ohio–5051, 2009 WL 3068751, ¶ 11, *citing Roberts* at 178, 405 N.E.2d 247, *quoting Franks* at 171–172, 98 S.Ct. 2674.

Appellant's motion to suppress asserts the affidavit in support of the search warrant included "untrue" or "limited" statements. Appellant does not allege deliberate falsehood or reckless disregard for the truth. The motion was not supported by affidavits or sworn, reliable statements of witnesses; nor did Appellant explain the failure to attach affidavits or statements of

witnesses. We find the trial court did not error in denying the motion without granting Appellant an oral hearing.

**{¶116}** *Id.* at ¶¶ 23-25. *See, also, State v. Schubert,* 5th Dist. Licking App. No. 2020 CA 00040, 2021-Ohio-1478.

**{¶117}** Appellant failed to attach an offer of proof to his motion, and failed to explain the absence of an offer of proof. At the suppression hearing, Appellant presented evidentiary proof as to several, but not all, his allegations concerning misrepresentations in the affidavit provided to obtain the search warrant. The trial court noted it did not condone Appellant's offer of such proof at the hearing with no notice to the prosecutor. Nevertheless, as to the allegations on which Appellant offered last-minute proof in support of his claims, the trial court in accordance with *Franks* and its progeny determined the issue of probable cause by excising the allegedly false statements. Appellant does not argue the court's ultimate determination of probable cause was in error, but only argues the trial court erred in failing to grant him a *Franks* hearing. We find no error in the trial court's denial of a hearing on allegations which Appellant failed to support with an offer of proof or an explanation of his failure to offer proof, as required by *Franks* and *Roberts, supra*.

**{¶118}** The sixth assignment of error is overruled.

VII.

**{¶119}** In his seventh assignment of error, Appellant argues trial counsel was ineffective for failing to seek relief from prejudicial joinder, failing to object to the admission

of voluminous medical exhibits which the jury could not be expected to understand, and failing to object to jury instructions as set forth in his fifth assignment of error.

{¶120} A properly licensed attorney is presumed competent. *State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). Therefore, in order to prevail on a claim of ineffective assistance of counsel, Appellant must show counsel's performance fell below an objective standard of reasonable representation and but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). In other words, Appellant must show counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

{¶121} **Joinder:** Appellant argues counsel was ineffective for not seeking relief from prejudicial joinder of offenses in the instant case.

{¶122} Crim. R. 8(A) provides two or more offenses may be charged together if they "are of the same or similar character…or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged "are of the same or similar character." *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293, 298 (1990).

{¶123} Appellant was charged and convicted of engaging in a pattern of corrupt activity. The individual charges all related to acts committed by Appellant as a part of his medical practice, and were all a part of the same course of criminal conduct. We find counsel was not ineffective in failing to seek relief from joinder because Appellant has not

demonstrated a reasonable probability the trial court would have severed the charges for trial.

{¶124} **Failure to object to medical records and expert reports:** Appellant argues counsel was ineffective for failing to medical records and expert reports on the basis they "contained material no juror could be expected to understand." Brief of Appellant, p. 54.

{¶125} Appellant cites no legal authority for his proposition the medical evidence in this case was inadmissible. In fact, much of the medical evidence was stipulated to by Appellant, and used by Appellant in support of his defense he treated patients in accordance with reasonable medical practice. We find counsel was not ineffective for failing to object to the admission of the medical records and expert reports in this case.

{¶126} **Jury instructions:** Appellant argues trial counsel was ineffective for failing to object to jury instructions, as set forth in his fifth assignment of error. For the reasons stated in our disposition of Appellant's fifth assignment of error, we find Appellant has not demonstrated a reasonable probability of a change in the outcome had counsel objected.

**{¶127}** The seventh assignment of error is overruled.

**{¶128}** The judgment of the Stark County Common Pleas Court is affirmed.

By: Hoffman, P.J.

Wise, John, J.  and

Wise, Earle, J. concur